UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PROWLER, LLC, et al.

    Plaintiffs,

    v.

YORK INTERNATIONAL CORP.,

    Defendant.

CASE NO. C06-660JLR

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

This matter came before the court for a bench trial beginning on July 10, 2007. Having heard testimony, examined the parties' evidence, and heard counsel's arguments, the court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

**The Installation Agreement**

1. In or around April 2003, Plaintiff Prowler, LLC ("Prowler") hired Defendant York International Corporation ("York") to replace a refrigeration system aboard Prowler's vessel, the F/V PROWLER.

2. Prowler and York entered into two contracts. The first was a written contract for the sale of all major system components (the "Equipment Contract"). The second was an oral agreement for the installation of the machinery and for the purchase of

FINDINGS & CONCLUSIONS – 1

ancillary system components, such as piping and pipe fittings (the "Installation Contract"). The Installation Contract was to be performed on a time and materials basis.

3. York's Jon Granath and Prowler's John Winther negotiated the terms of both agreements.

4. Mr. Winther hired York because he considered York an excellent refrigeration company, and because he had enjoyed a positive working relationship with York in the past. York's employees uniformly testified that they enjoyed working with Mr. Winther.

5. At no time during the negotiation of the oral Installation Contract, did Mr. Granath tell Mr. Winther that York's boilerplate "Terms and Conditions" would apply. The Terms and Conditions purport to extensively limit York's liability. See Ex. 3 at 2, 4, 6, 8.

6. After beginning work on the F/V PROWLER, York sent Prowler three invoices, dated June 25, 2003, July 30, 2003, and September 26, 2003. Id. Of the three invoices, only the first listed the Terms and Conditions on the back-side of the document. Id.

7. In billing for work pursuant to prior contracts, York did not attach its Terms and Conditions to invoices it sent to Prowler. See Ex. 4.

**The Installation of the Refrigeration System**

8. York installed an ammonia-based refrigeration system on the F/V PROWLER between May and September of 2003 at a shipyard in Reedsport, Oregon. The F/V PROWLER underwent a major overhaul during this time-period, with multiple contractors working on the vessel at any given time.

9. The installation and testing of the piping, coils, and pipe fittings located in the cargo hold, also referred to as the "freezer hold," occurred pursuant to the

FINDINGS & CONCLUSIONS – 2

Installation Contract. York employees Guy Block, Jesus Canonizado, and Roland Vasquez had responsibility for completing the majority of the work in the cargo hold. Mr. Block was the "lead man."

10. York employees placed the refrigeration piping and coils near the ceiling in order to limit the likelihood of F/V PROWLER crew members bumping into the pipes and coils, which are filled with ammonia when the system is operational.

11. Prowler instructs the crews aboard the F/V PROWLER to load the fish product in such a way so as to avoid coming into contact with the coolant-filled piping and coils.

12. Prowler also trains its crew aboard the F/V PROWLER on how to respond to an ammonia leak.

13. Following installation of the piping, coils, and pipe fittings, Mr. Block installed a gauge assembly[1] near the ceiling of the cargo hold, affixed to a portion of the piping.

14. Neither the operations manual nor the design drawings that York prepared for Prowler for the refrigeration system referenced the gauge assembly.

15. The gauge assembly includes a male-threaded tee that connects to the refrigeration piping on one arm, a valve on a second arm, and a female-threaded tee on a third arm. The female tee, in turn, connects to a pressure gauge that sits perpendicular to the refrigeration piping. When the refrigeration system was operational, the remaining "open" arm of the female tee held a stopper.

16. Only when the valve is in the open position does the pressure gauge come into contact with the coolant used in the refrigeration system.

---

[1] Throughout the course of the trial, witnesses referred generically to "the gauge" as a stand-in for the assembly as a whole. The court uses the more specific term, "gauge assembly" to differentiate from the gauge itself. The court disagrees with Defendant's assertion that it should discredit or somehow limit testimony that fails to distinguish the two.

FINDINGS & CONCLUSIONS – 3

17. During all relevant times, the F/V PROWLER's refrigeration system used ammonia as a coolant. The pressure gauge that York installed in the cargo hold as part of the gauge assembly was compatible with nitrogen, but not meant for long-term exposure to ammonia.

18. York employees installed the gauge assembly in order to pressure-test the piping and coils within the cargo hold in isolation from the remainder of the refrigeration system, which was not yet complete. The pressure test, performed by Mr. Block, Mr. Canonizado, and Mr. Vasquez, consisted of filling the piping and coils within the cargo hold with nitrogen, and soap-testing all the welds and joints for leaks.

19. York employees had never before performed a pressure test on only one section of a refrigeration system. Ordinarily, they would pressure-test an entire refrigeration system upon completion. The reason for conducting the pressure test in piecemeal fashion was so that York could finish work in the cargo hold to allow another contractor performing insulation services to access the area, while York turned to another portion of the refrigeration system.

20. Although he ultimately regretted the decision, Mr. Block determined that the gauge assembly could safely remain in the system on a permanent basis. To that end, he positioned the gauge near the ceiling in an attempt to keep it out of the way of the F/V PROWLER crew, who he knew would work in the cargo hold, loading and stacking heavy bags of fish product.

21. Before conducting the pressure test, Mr. Block discussed the status of the project with Mr. Winther. He told Mr. Winther that he could either leave the gauge assembly in place or remove it. Mr. Block also mentioned that the gauge could provide a useful function during the defrosting process. Although the testimony is entirely unclear on the issue, the court accepts that Mr. Winther agreed that the

gauge assembly could remain in place, but said nothing as to whether it should remain permanently in the cargo hold.

22. York successfully performed the pressure test. Following the pressure test, Mr. Vasquez expressed his concerns to Mr. Block about leaving the gauge assembly in place.

23. Sometime in September 2003, Prowler relocated the vessel to Seattle, Washington, where York employees discharged the nitrogen from the cargo hold's piping and coils, and charged the entire refrigeration system with ammonia.

24. At some point prior to charging the refrigeration system, one of the York employees closed the valve on the gauge assembly, preventing the coolant from coming into contact with the gauge.

25. It was York's usual practice to remove any testing instruments in a refrigeration system prior to operation. York employees did not remove the gauge assembly when they had completed their work aboard the vessel in Seattle. Notably, Mr. Block – the employee who installed the gauge assembly and discussed its purpose with Mr. Winther – was not in Seattle when other York employees charged the refrigeration system with ammonia.

26. The gauge assembly served no useful function once York completed the pressure testing. Under normal operating conditions, the gauge, like the other objects in the cargo hold, would have been covered in ice and therefore unreadable. Likewise, the gauge would not have been useful during the defrosting process, as Mr. Block described to Mr. Winther, because the gauge was not ammonia-compatible. In any event, during the relevant period of operation, the valve on the gauge assembly remained in the closed position.

27. Beyond its failure to serve any useful function, the gauge assembly presented an unnecessary hazard in the cargo hold.

FINDINGS & CONCLUSIONS – 5

28. Other than the initial conversation between Mr. Block and Mr. Winther, York employees did not communicate to Prowler employees that the gauge remained in the cargo hold. Indeed, members of the F/V PROWLER crew working in the cargo hold had no idea of its existence.

**The Ammonia Leak**

29. The F/V PROWLER's refrigeration system functioned without incident during the fishing seasons between September 2003 and February 17, 2005.

30. On February 17, 2005, Prowler's crew member Sylvester Trojanowski inadvertently struck the gauge assembly while moving bags of fish product in the cargo hold. The cargo hold was nearly full at the time, leaving only a small space for Mr. Trojanowski to work, and requiring him to step on stacked bags of fish product and crouch to avoid hitting his head on the refrigeration pipes or the ceiling.

31. The gauge assembly broke off where the male-threaded tee of the assembly connects to the refrigeration piping. Pressurized ammonia sprayed into the cargo hold.

32. Mr. Trojanowski noticed the ammonia leak immediately and reported it to his foreman, who informed the captain. The crew followed appropriate emergency response procedures. Eventually, using a respirator, crew member Cole Reich entered the cargo hold and placed a plug in the opening where the gauge assembly had been in order to stop the ammonia leak.

33. After ventilating the cargo hold, the F/V PROWLER crew fished for one more day before heading to Dutch Harbor, Alaska. Upon arrival and following an inspection, the Alaska Department of Environmental Conservation declared the product stowed in the cargo hold a total loss and directed Prowler to destroy it. The market value of the fish product would have been $630,947.78.

FINDINGS & CONCLUSIONS – 6

34. Prowler paid $4,645 to transport the contaminated product to a nearby landfill, owned by the City of Unalaska. Unalaska charged Prowler $57,634.74 for landfill services.

35. The court finds that if the ammonia leak had not occurred on February 17, 2005, the crew would have off-loaded some of their cargo and returned to the fishing grounds for two additional days of fishing. On average, the F/V PROWLER crew caught fish product valued at $28,824 per day during the 2005 season. Less Prowler's expenses, two days of lost fishing time totals $31,130 in lost profit.

36. In responding to the ammonia leak, Prowler incurred the following expenses that it would not have otherwise incurred, summarized as follows:

| | |
|---|---|
| Forklift operations | $2,177.83 |
| Safety equipment (cartridges, face mask, etc). | $2,012.46 |
| Cargo inspection | $342.48 |
| Refrigeration gas | $2,562.13 |
| Travel and lodging expenses for Prowler employees | $1,235.97 |
| **TOTAL** | $8,330.87 |

37. Prowler also claims damages based on crew wages for offloading contaminated fish product and travel expenses for Prowler employees. The court finds that Prowler has not proven that it incurred these expenses as a result of the ammonia leak.

38. Based on the above, the court finds that damages arising from the ammonia leak total $732,688.39.

39. Prowler tendered a claim to its insurance company, and Plaintiff Certain Underwriters at Lloyds of London ("Lloyds") reimbursed Prowler in the amount of $689,041.77. Lloyds is subrogated to this amount.[2]

## CONCLUSIONS OF LAW

1. The claims against York arise under this court's admiralty jurisdiction, 28 U.S.C. § 1333. Prowler alleges claims for breach of implied warranties (workerlike performance, merchantability, and fitness for a particular purpose), negligence, and products liability.

2. At the threshold, the court concludes that York's standard Terms and Conditions printed on the backside of one of three invoices it sent to Prowler do not constitute part of the oral Installation Contract. Mr. Granath never mentioned the Terms and Conditions in negotiating the Installation Contract, and Mr. Winther never received a copy or agreed to be bound by such terms.[3] Cf. Gulf Towing Co., Inc. v. S.T. Amoco New York, 648 F.2d 242 (5th Cir. 1981) (holding that liability disclaimer presented in a receipt was not supported by consideration, and therefore unenforceable).

3. To be sure, where parties share a history of business dealings that incorporate standardized provisions, such familiar provisions printed on invoices may be enforceable. See, e.g., Insur. Co. of No. Am. v. NNR Aircargo Serv. (USA), Inc.,

---

[2] For sake of clarity, the court refers generically to "Prowler" as the Plaintiff, given that Lloyd's claims are coterminous with its insured.

[3] The court distinguishes the facts in the instant case from those set forth in M/V Am. Queen v. San Diego Marine Const. Corp., 708 F.2d 1483 (9th Cir. 1983). There, the Ninth Circuit reasoned that adequate consideration supported a vessel repair contract containing a liability limitation clause that the shipowner received after the work was complete. Id. at 1488-89. Unlike this case, the vessel owner in M/V Am. Queen signed the receipt, which contained an integration clause, and knew that he would have to supplement an earlier written contract during the course of the repair work. Id. at 1489.

FINDINGS & CONCLUSIONS – 8

201 F.3d 1111, 1114 (9th Cir. 2000) (applying "course of dealing" analysis to uphold liability limitation clause in goods contract where the contractor included the provision in forty-seven identical invoices over the course of forty-seven separate transactions). In this instance, however, there is no evidence that York routinely provided such Terms and Conditions on the backside of invoices it sent to Prowler. Thus, Prowler had no notice of such terms. The court concludes that the contracting parties intended the oral Installation Contract to stand as the exclusive agreement between them.

**Negligence and Implied Warranty of Workerlike Performance**

4. Unique to admiralty law, a shipowner may sue in either tort or contract for negligent repairs to his or her vessel. See La Esperanza de P.R., Inc. v. Perez y Cia de Puerto Rico, Inc., 124 F.3d 10, 16 (1st Cir. 1997); Alcoa S.S. Co. v. Charles Ferran & Co., 383 F.2d 46, 50 (5th Cir. 1967); see also Schoenbaum, Thomas J., ADMIRALTY AND MARITIME LAW, § 5-7 (4th ed. 2004). Perhaps not surprisingly, courts often fail to distinguish between negligent performance of services (a tort claim) and breach of the implied warranty of workerlike[4] performance ("WWLP") (a contract claim). See Davis, Charles, MARITIME LAW DESKBOOK, § XV K(2) (2005) (noting that negligent performance of services constitutes breach of the WWLP, and thus courts often blur the distinction); Schoenbaum, *supra* (noting that the WWLP is "rooted in the concept of negligence").

5. Moreover, courts apply comparative fault principles whether the shipowner's claim sounds in tort or court. See Agrico Chem. Co. v. M/V Ben W. Martin, 664

---

[4] The court substitutes the outmoded "workmanlike" term for "workerlike," coined by the Fifth Circuit in Sea-Land Service, Inc. v. Crescent Towing & Salvage Co., Inc., 42 F.3d 960 (5th Cir. 1995).

FINDINGS & CONCLUSIONS – 9

F.2d 85, 93-4 (5th Cir. 1982); Ensco Marine Co. v. Bird-Johnson Co., No. 3-489, 2004 WL 2984338, *8 (E.D. La. December 15, 2004).

6. Based on the above, the court considers Prowler's negligence and implied WWLP claims together. See Pls.' Trial Brief at 10 (inviting the court to analyze claims together).

7. The implied WWLP requires a contractor to make ship repairs in a skilled and workerlike manner. See H&H Ship Serv. Co. v. Weyerhaeuser Line, 382 F.2d 711, 712 (9th Cir. 1967); Little Beaver Enterp. v. Humphreys Railways, 719 F.2d 75, 77 (4th Cir. 1983). The essence of the contractor's warranty of workerlike performance is to perform the work "properly and safely." Coffman v. Hawkins & Hawkins Drilling Co., Inc., 594 F.2d 152, 154 (5th Cir. 1979) (internal quotation and citation omitted). Notably, the implied WWLP is a ground for liability where a contractor chooses equipment for a specific purpose that is defective or unsafe. See Little Beaver, 719 F.2d at 77 (citing Am. Presidents Lines Ltd. v. Marine Terminals Corp., 234 F.2d 753, 758-60 (9th Cir. 1956)).

8. In order to prevail on its implied WWLP claim, Prowler must show that York failed to use the degree of diligence, attention, and skill adequate to complete the task, and that it suffered damages as a result. See Little Beaver, 719 F.2d at 77 (citing Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp., 350 U.S. 124, 133 (1956)).

9. In order to prevail on its negligence claim, Prowler must prove the following elements: (1) duty; (2) breach; (3) causation; and (4) damages.

10. The court concludes that York warranted workerlike performance when it entered into the Installation Contract to install a refrigeration system aboard the F/V PROWLER, that it negligently performed its services when it failed to remove the gauge assembly from the cargo hold once the system was operational, and that

FINDINGS & CONCLUSIONS – 10

York's negligent performance was a cause of the ammonia leak, contaminating the product inside the cargo hold.

11. Prowler's expert provided credible testimony that leaving the gauge assembly in the cargo hold was neither proper nor safe. Further, York's own employees testified that they had concerns about placement of the gauge assembly. Indeed, Mr. Vasquez raised the issue with Mr. Block the same day it was installed. Although Mr. Block's testimony wavered on this point, he too had concerns about leaving the gauge in place, but stated that he believed Mr. Winther wanted him to do so. Admittedly, failing to remove a test instrument was contrary to York's standard practice.

12. York had a duty to remove the gauge assembly in the cargo hold after it completed the pressure test or, at a minimum, secure the assembly to avoid accidental impact and provide a warning to crew working in the area.

13. Even if Mr. Winther had directed York employees to leave the gauge assembly in place for some indeterminate amount of time, York employees bore the ultimate responsibility for installing the refrigeration system with a degree of skill and diligence expected of a reputable, and by all accounts, skilled team of workers. The very fact that York employees had concerns over the presence of the gauge assembly in the cargo hold only underscores that York was in the best position to evaluate the safety of leaving the instrument in place. Further, that Mr. Block was not present in Seattle when other York employees charged the system with ammonia strongly suggests that York simply forgot to remove the gauge assembly once the pressure testing was complete.

14. The court further concludes that Mr. Trojanowski was negligent in loading the fish product in the cargo hold. He would not have struck the gauge assembly had he

FINDINGS & CONCLUSIONS – 11

kept the fish product away from the overhead piping and coils, as instructed. Mr. Trojanowski's conduct was a cause of the ammonia leak.

15. The percentage of fault attributable to York is 80%; the percentage of fault attributable to Prowler is 20%.

**Products Liability**

16. The Ninth Circuit applies section 402-A of the Restatement (Second) of Torts to product liability claims in admiralty. See Pan-Alaska Fisheries, Inc. v. Marine Const. & Design Co., 565 F.2d 1129, 1134 (9th Cir. 1977). The Restatement provides:

> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>
>> (a) the seller is engaged in the business of selling such a product, and
>> (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
>
> (2) The rule stated in Subsection (1) applies although
>
>> (a) the seller has exercised all possible care in the preparation and sale of his product, and
>> (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Restatement (Second) § 402-A (1965).

17. Retailers and installers of marine equipment, like York, are "sellers" subject to strict liability under this theory. See Pan-Alaska, 565 F.2d at 1135 (9th Cir. 1977) (holding that retailer who purchased and installed defective engine was considered a "seller"). York does not contend otherwise, but contests liability.

18. Prowler contends that under the "risk-utility balancing test," York is strictly liable. This balancing test "weighs the utility of the product against the gravity of the danger. If, after considering the utility of the product, the economic and practical

FINDINGS & CONCLUSIONS – 12

feasibility of alternative designs, and the gravity and likelihood of the potential harm, the factfinder determines that the risk outweighs the utility, the product is deemed defective or unreasonably dangerous." Saratoga Fishing Co. v. Marco Seattle, Inc., 69 F.3d 1432, 1441 (9th Cir. 1995), rev'd on other grounds, 520 U.S. 875 (1997).

19. The court concludes that the design of the refrigeration system, because it included a gauge assembly inside the cargo hold, was defective. As stated, the gauge assembly served no utility once the refrigeration system was operational. Further, Prowler provides evidence that a no-cost, obvious alternative design was available, namely, removing the gauge assembly from the refrigeration system. This alternative design would have indeed conformed to York's standard practice, and would have eliminated the risk of an ammonia leak from the point of connection. Notably, York does not contend that the system was safe, only that it did not bear responsibility for the gauge assembly's placement – an argument that the court has previously rejected. York Trial Br. at 15 (noting that the issue of whether there exists a defect "resolves [sic] solely around the placement of the [gauge] assembly"). In short, the risk of leaving the gauge assembly in the cargo hold outweighs any utility.

20. That the gauge itself did not "fail" is not dispositive of Prowler's claim because its very presence inside the cargo hold constituted a defective condition.

21. Although liability is strict, courts sitting in admiralty apply comparative fault principles to limit the award of damages to account for plaintiff's contribution to his or her own loss or injury. See Pan-Alaska, 565 F.2d at 1138-30. Because the court has found that Prowler contributed to its own loss, the court apportions fault in the same manner as indicated for the negligence and WWLP claims.

FINDINGS & CONCLUSIONS – 13

**Warranties of Merchantability and Fitness for a Particular Purpose**

22. Prowler contends that the implied warranties of merchantability and fitness for a particular purpose under the Uniform Commercial Code ("UCC") apply to the Installation Contract. Pls.' Brief at 15-16 (citing UCC § 2-314, 2-315).

23. The court concludes that Prowler has failed to show that the Installation Contract is subject to the implied warranties contained in Washington's version of the UCC, codified at RCW § 62A.314, 315. Cf. Princess Cruises, Inc. v. Gen. Elec. Co., 143 F.3d 828, 832-34 (4th Cir. 1998) (reasoning that maritime service contract was not covered by the UCC). Prowler assumes that the UCC applies, without attempting to explain how the Installation Contract constitutes a contract for the sale of goods governed by the Code. Whether the contract is one for goods or services is primarily a question of fact. See Tacoma Athletic Club, Inc. v. Indoor Comfort Sys., Inc., 902 P.2d 175, 179 (Wash. Ct. App. 1995).

24. Even if Prowler had attempted to develop the record on this issue, the court would have likely concluded that, under Washington law, the Installation Contract is a contract for services, and not goods. See Arango Const. Co. v. Success Roofing, Inc., 730 P.2d 720, 722 (Wash. Ct. App. 1986) (reasoning that construction contract to build roof was outside scope of UCC, even though contract contained both labor and materials). The sale of piping, coils, and components of the gauge assembly (some of which do not appear on the invoices) was incidental to the primary purpose of the contract, which was to provide installation services. See Tacoma Athletic, 902 P.2d at 178-79 (determining applicability of UCC based on predominant purpose of transaction); Princess Cruises, 143 F.3d at 832-33 (same). Each of the three invoices state, "Install Refrigeration Equipment" under the heading "Description," and the majority of the amount charged constitutes costs

FINDINGS & CONCLUSIONS – 14

for labor, not parts. Indeed, the parties contracted separately for the purchase of major system components under the "Equipment Contract."[5]

25. Because Prowler has failed to show that the Installation Contract is subject to the UCC, the court limits Prowler's breach of implied warranties claim to the implied WWLP claim.[6]

**Damages and Interest**

26. Whether the court applies a remedy in tort or contract, damages arising from the ammonia leak total $732,688.39. The court limits Prowler's recovery by 20% to account for its contribution of fault.

27. The court awards prejudgment interest to run from the date of the incident, February 17, 2005, at the rate provided in 28 U.S.C. § 1961(a) for calculating post-judgment interest. See Western Pac. Fisheries, Inc. v. SS President Grant, 730 F.2d 1280, 1288 (9th Cir. 1984) ("It is well-established that compensatory damages in maritime cases normally include pre-judgment interest.").

---

[5] The court recognizes the facial incongruity in concluding that Prowler has failed to show that York is a "seller" or "merchant" for purposes of the UCC claims given that the court is satisfied that York is a "seller" for purposes of the products liability claim. Although a distinction neglected by Prowler, the court notes that the two claims arise under separate lines of authority, with the Ninth Circuit adopting a comparatively generous definition of "seller" in Pan-Alaska. Although the court would ordinarily expect to find facts that would support both implied warranty claims under the UCC and products liability claims under state law, the court finds in this instance that Prowler, who bears the burden to prove each element of its claim, has failed to show that the UCC applies in this case.

[6] The court notes that even if it considered Prowler's implied warranty claims under the UCC, the harm complained of is indistinguishable from those arising under the WWLP claim.

FINDINGS & CONCLUSIONS – 15

**ORDER**

Based on the foregoing findings of fact and conclusions of law, the court orders as follows:

1. Plaintiffs shall recover $586,150.72 in damages, plus pre-judgment interest to run from February 17, 2005 until the date of this order, and post-judgment interest to run from the date of this order at a rate of 4.78% until paid in full.

2. Plaintiffs shall submit a proposed judgment to the court on or before August 20, 2007 consistent with the above findings of fact and conclusions of law.

Dated this 14th day of August, 2007.

JAMES L. ROBART
United States District Judge